Renner & Maras, Inc. v. Commissioner.
Renner & Maras, Inc. v. Commissioner
Docket No. 20949.
United States Tax Court
1950 Tax Ct. Memo LEXIS 189; 9 T.C.M. (CCH) 451; T.C.M. (RIA) 50139; June 2, 1950
*189 Benjamin Mahler, Esq., 39 Broadway, New York 6, N. Y., for the petitioner. William A. Schmitt, Esq., and William Edwards Murray, Esq., for the respondent. MURDOCK Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies as follows: Declared
value-Excess-
Excess
profits Tax
Profits Tax
1943
$3,002.43
$18,049.68
1944
1,200.03
15,882.38 He also determined a deficiency of $87.33 in income tax for 1945 which is not in controversy. The issues for decision are whether the Commissioner erred (1) in treating the amounts which the petitioner received in 1943 and 1944 from King Industries Company as rent, taxable in their entirety, instead of recognizing that the transaction was a sale and the profit was taxable to the petitioner in 1943 as a capital gain, and (2) in failing to allow a deduction of $5,922.87 in 1944 representing expenses and real estate taxes. Findings of Fact The petitioner is a corporation. It filed returns for the calendar years 1943 and 1944 with the collector of internal revenue for the first district of New York. The petitioner was engaged in manufacturing ornamental iron at a plant owned *190 by it at 37-14 33rd Street, Long Island City, New York. Maras was the principal stockholder of the corporation and made all decisions on its behalf. He advertised the plant of the petitioner for sale in the early part of 1943. The depreciated cost of the property of the petitioner as of January 1, 1943 was $50,525.70. The property was encumbered by mortgages on which the unpaid balance of principal was $30,450. Maras at some time in May 1943 had negotiations with a partnership known as King Industries Company, the partners of which were Raymond H. King and John J. Tumpane. The partnership was desparately in need of a plant in which to carry on war work but had no funds with which to buy a plant. It wanted to rent the petitioner's plant but Maras offered to sell the plant to the partnership for $85,000. The plant could accommodate about 100 workmen whereas the petitioner had only about 11 employees at that time. Maras advised the partnership that it could move in under a temporary arrangement whereby it would pay rent for use of the plant and machinery until July 1. The partnership wrote Maras a letter dated May 20, 1943 which was as follows: "In accordance with our talk of *191 last evening, we agree to purchase of your plants and property on July 1, 1943 for the sum of $85,000. The purchase payments to be made as follows: $2,000. on July 1st, 1943, $3,000. on August 1, 1943 and $4,000. on September 1, 1943 and $4,000. on the first of each month thereafter until the whole of the purchase price is paid. "In the meantime we are to pay you $200. per week until July 1, 1943. "It is also understood that should you at any time find another buyer with a more attractive offer or for any other reason you should wish to cancel this arrangement you may do so." The petitioner entered into a "Memorandum of Agreement" with the partnership on May 29, 1943, in which it was provided that the partnership "agrees to purchase the plant and machinery" for $85,000. The property sold and the mortgages to which it was subject were described in the agreement. The petitioner agreed to discharge the mortgages when the entire purchase price was paid but the partnership had the right to take title subject to the mortgages, in which case the unpaid balance on the mortgages was to be subtracted from the purchase price. Paragraph 9 was as follows: "King Industries Company may enter *192 upon the premises immediately, but this occupancy shall be construed as that of landlord and tenant only until all payments under this contract shall have been made. "King Industries Company will pay $200.00 per week until July 1st, 1943, or a total of $1,200.00, which payments shall not be applied on the purchase price but shall be for the use of the plant until that time." Paragraph 10 provided that the $85,000 should be paid in monthly payments but that provision was later changed by an oral agreement under which the partnership was to pay $1,000 per week. The following provision of paragraph 10 was not changed: "In case of default in any of the payments aforesaid, this agreement shall come to an end and all payments made on account shall be considered rent for the use of the premises and the machinery, and King Industries Company agrees to immediately vacate the premises." Paragraph 11 provided that until the purchase price was fully paid the petitioner could conduct its business on the premises without the payment of rent; Maras could occupy the house thereon without the payment of rent; another house could be occupied by a tenant of Maras; Tribore Platers, Inc. could *193 occupy the building then occupied by them; and the property of a former tenant could be left in the garage, all without the payment of any rent to the partnership but the rent paid by the tenants was to belong to the petitioner. The petitioner and all other tenants were to vacate the premises when the partnership had made all payments required of it unless they made satisfactory arrangements with the partnership at that time. The petitioner was to give the partnership a deed for the property and a bill of sale for the machinery when all payments had been made. The closing of title was to be "as of July 1, 1943" and all adjustments for water, taxes, interest and insurance were to be made as of that day. Also, interest on the purchase price was to be computed from that date. Meanwhile the petitioner was to pay all taxes, water, interest on mortgages and insurance, while power, light, telephone and other incidentals were to be adjusted monthly. Paragraph 17 provided that all worn or damaged equipment used by the petitioner was to be replaced by it at its own cost. Paragraph 20 was as follows: "A formal agreement embodying in substance the foregoing provisions, shall be executed by the *194 parties within the next ten days." The parties never executed any formal agreement in accordance with paragraph 20. The agreement of May 29, 1943 was drawn by the petitioner's lawyer. The partnership had no part in drawing it and would have signed any agreement in order to get the plant. The payments called for by the agreement of May 29, 1943, as orally modified, were made until April 1, 1944, $23,000 having been paid in 1943 and $16,000 in 1944. Tumpane sold his interest in the partnership of King Industries Company in January, 1944. King continued the business thereafter, using several plants in addition to the one obtained from the petitioner, but in April, 1944 he vacated the premises here in question and they were reoccupied by the petitioner which had continued in business. The petitioner on its original return for 1943 reported no income or profit as a result of the contract of May 29, 1943 but deducted depreciation on the plant and equipment for the full year. It filed an amended return for 1943 on May 18, 1945 in which it reported $34,474.30 as a capital gain, realized in 1943 from the transaction under the agreement of May 29, 1943 and deducted no depreciation *195 on the plant and equipment after July 1. The petitioner on its return for 1944 reported $3,528.90 as profit realized in that year on the transaction respecting the property here in question. That amount was arrived at by deducting $34,474.30, the profit reported for 1943, and $996.80, depreciation on the property during the period of occupancy by the partnership, from $39,000, the total cash received from the partnership. The property originally acquired by the petitioner included a strip roughly described as 30 feet wide and 188 feet long which had once been part of a public street. It was valued for tax purposes at $7,500. It was described as parcel II of the seven parcels owned by the petitioner. The City of New York assessed real estate taxes on that property but the petitioner, upon advice of counsel, had failed and refused to pay those taxes upon the theory that the property constituted a public thoroughfare and was not subject to taxes. The petitioner keeps its books and files its returns on an accrual basis of accounting but deducts taxes as paid and it had never accrued any taxes on parcel II. The city, at a sale held on February 4, 1943, bought the lien in the total *196 amount of $25,080.11, representing the unpaid taxes on parcel II up to June 30, 1941. The petitioner later in 1944 set up on its books a liability of $5,000 on account of real estate taxes to be paid in connection with parcel II. It also accrued on its books during 1944, $1,209.31 representing one-half of the taxes for the period ended December 31, 1943, assessed in 1943 but due in April, 1944, and taxes for the first half of the next period assessed in 1944 and due in October, 1944. Taxes in the total amount of $6,792.62 were deducted on its return for 1944. The Commissioner allowed $1,393.88 thereof and disallowed the remainder of $5,398.74. An attorney for the petitioner went to the city taxing authorities in an effort to compromise the taxes on parcel II because of a fear that they might be made a lien against the rest of the tract. He offered to pay about $2,500 to $3,000 late in 1944 but the City Tax Collector rejected that offer and indicated that it would take about $5,000 to satisfy the tax lien. Neither the petitioner nor anyone acting in its behalf admitted to the taxing authorities during 1944 any liability for the taxes on parcel II covered by the tax lien owned by *197 the city. Later, after further negotiations by another attorney employed after 1944, all taxes on parcel II up to June 30, 1941 were compromised by a payment in 1946 in the amount of $4,361. The petitioner at that time paid its attorney $750 in connection with the compromise. The petitioner, on April 11, 1947, paid in full, with interest, the taxes assessed against parcel II for the period beginning July 1, 1941 and ending June 30, 1946. The payment consisted of $1,133.25 as taxes and $254.75 as interest. The stipulation of facts is incorporated herein by this reference. Opinion MURDOCK, Judge: The respondent has held and here insists that the $23,000 received by the petitioner in 1943 and the $16,000 received in 1944 represent rent taxable as ordinary income. The petitioner contends that the payments are not rent since the contract of May 29, 1943 resulted in a conditional sale of a capital asset, the gain from which was a long-term capital gain for 1943. The Commissioner makes no objection to the petitioner's method of reporting if there was a sale. The contradictory nature of the contract of May 29, 1943, drawn by the then counsel for the petitioner, makes decision of *198 the case unusually difficult. The partnership agreed to purchase the plant and machinery of the petitioner for $85,000, and it was to receive a deed for the property when it had paid in full. Those provisions and the size of the payments indicate that the agreement was one of conditional sale. However, it also contains other provisions which give the Commissioner considerable support for his view that the payments were rent. One is found in paragraph 9 to the effect that the occupancy of the premises by the partnership "shall be construed as that of landlord and tenant only until all payments under this contract shall have been made." The testimony of the attorney who drew the document that paragraph 9 was intended to be a separate contract and the quoted portion applied only to the $200 a week payments up to July 1, 1943, is not convincing. The provision in paragraph 10 that in case of default all payments made "shall be considered rent" supports the Commissioner. The same witness testified that the word "rent" in paragraph 10 was intended to mean, not rent, but liquidated damages, which latter words were not used because the New York courts frown on the payment of liquidated damages *199 as unconscionable. In other words, the purpose was to take care of the petitioner in any eventuality, if the agreement came before some New York court, it would be misled into believing that the payments were rent, whereas if the agreement came before some other court, the Tax Court, the petitioner could explain that the payments were not rent but liquidated damages. Explanations of that kind are not particularly convincing. The fact that the petitioner continued its operations on the property and continued to collect rent from other tenants on the property, as well as the provisions in regard to the replacement of worn or damaged tools and damage to machinery, give some support to the Commissioner. The petitioner's action in originally deducting depreciation on the plant and equipment for the last half of 1943 likewise supports the Commissioner's view. The failure to enter into a "formal agreement" is puzzling but not helpful one way or the other. King and Tumpane disagreed as witnesses on the purpose of the agreement although both expected a formal agreement to be prepared. However, the following from the case of (March 17, 1950), *200 in which the Commissioner was contending that a sale had taken place, is appropriate here: "Cases like this, where payments at the time they are made have dual potentialities, i.e., they may turn out to be payments of purchase price or rent for the use of property, have always been difficult to catalogue for income tax purposes. A fixed rule for guidance of taxpayers and the Commissioner is highly desirable, and it is also desirable that the rule, whatever it is, be as fair as possible, both to the taxpayer and the tax collector. If payments are large enough to exceed the depreciation and value of the property and thus give the payor an equity in the property, it is less of a distortion of income to regard the payments as purchase price and allow depreciation on the property than to offset the entire payment against the income of one year. That is the rule laid down in the Judson case and it finds support in section 23 (a) (1) (A). The payee, meanwhile, is not reporting the payments, since they are purchase price rather than rent, and his gain or loss can be determined at the time of the final outcome of the transaction. The Judson Mills and Truman Bowen cases, being the most recent *201 ones and seeming to establish the more equitable rule, will be followed herein and the Commissioner's disallowance of the deductions will be allowed to stand." It appeared in that case that the petitioner was not required to buy the property and was to have no legal title to it until and unless the payments equaled $70,000. That petitioner on two occasions had seriously considered giving up the contract and returning possession of the property, but it was held, nevertheless, that the payments were a part of the purchase price and not deductible by the payor. Here the only difference is that the petitioner is the payee. The payments of $1,000 per week were far in excess of depreciation on the property. Again following the rule established by the , and , cases, it is held that the payments were not rent but resulted in a capital gain. The other issue has to do with the amount which the petitioner is entitled to deduct for 1944 as taxes on parcel II. Deductions allowed for taxes on other parcels are not in controversy. $750 which it paid in 1946 to an attorney hired after 1944 is, of course, not deductible *202 in 1944. The petitioner paid $4,361 in 1946 in compromise of a tax lien held by the city on parcel II relating to taxes on that parcel up to June 30, 1941. The petitioner had refused and failed to pay those taxes as they accrued and had not accrued them on its books. It did not admit liability for those taxes to the taxing authorities at any time prior to or during 1944. It set up on its books in 1944 a liability of $5,000 on account of taxes in connection with parcel II because it was afraid the lien might be extended to its other property, but that was not an admission to the taxing authorities of liability for the past due taxes. The Court in , said: "It is settled by many decisions that a taxpayer may not accrue an expense the amount of which is unsettled or the liability for which is contingent, and this principle is fully applicable to a tax, liability for which the taxpayer denies, and payment whereof he is contesting." The tax need not be contested in a court proceeding; denial of liability and refusal to pay is enough. . The Commissioner *203 did not err in disallowing the deduction of those taxes for 1944. Likewise, the taxes on this property for the period beginning July 1, 1941 and ending December 31, 1944, are not deductible in 1944. The petitioner had been denying liability for all taxes on the property and had not admitted any liability up to the close of 1944. The mere fact that it accrued these taxes on its books in 1944 because it was afraid they would become a lien against its other property is no justification for their deduction in 1944, in view of the further fact that the petitioner had always denied liability and had continued to refuse to pay them. Decision will be entered under Rule 50.